## ALLISON *v.* SUTLIVE.

*Lumpkin, J.*—1. One of the issues upon the trial being whether or not a particular person had engaged in a given business on his own account, and not as the secret agent of another, evidence tending to show the affirmative of this issue was properly admitted, though as to other issues in the case it may have been entirely irrelevant.

2. Where a principal transacts business through an agent in the agent's name, the fact of agency being kept concealed, third persons contracting with the agent are entitled to the same rights and equities against the undisclosed principal as they would have against the agent were he the real principal. Under such circumstances, the principal is bound by any contract which the agent makes within the scope of the agency.

3. There was no material error in any of the rulings or charges

complained of, nor in refusing to charge as requested; the in-
structions given by the court were sufficient to fully guard all
the rights of the losing party; the evidence warranted the ver-
dict, and there was no error in denying a new trial.

*Judgment affirmed.*

June 12, 1896. By two Justices. Argued at the last term.

Garnishment and claim.  Before Judge Griggs.  Clay
superior court.  March term, 1895.

Sutlive brought suit in November, 1892, upon account
against Tumlin, and caused garnishment to issue and be
served upon the Bank of Fort Gaines.  Toombs afterward
brought suit against said bank for the recovery of certain
cotton.  The bank filed its answer to the garnishment, stat-
ing that it had $242.60 and a warehouse receipt for a bale
of cotton; that Tumlin deposited a sum of money as a
bonus, under an agreement with the bank to pay for cotton
which he would purchase; that after some months of deal-
ing, it had, at the date of service of the summons of gar-
nishment, a balance of $244.60 and the bale of cotton be-
fore referred to and the proceeds of sale of cotton to the
credit of Tumlin; that Toombs had begun suit for the pos-
session of the cotton and bonus of which the amount in the
bank's hands was the proceeds; and it asked for such order
as would protect it from loss.  This answer was traversed
by Sutlive.  The bank also filed a motion stating that the
fund shown by its answer to be in its hands was placed there
by Tumlin as his money and property; and praying that
Toombs be made a party to the garnishment proceeding,
and that he and Tumlin be required to interplead.  An or-
der was passed making Toombs a party as was prayed.  He
pleaded that no part of the money due the bank was due
Tumlin, but was due Toombs for the use of Allison.  At
the same time Allison moved to be made a party, on the
ground that the claim of Toombs against the bank had been
transferred to him for a valuable consideration; and the mo-
tion was granted.  Sutlive obtained judgment against

Tumlin in his original suit on March 22, 1894, for $268.16 principal, and $44.24 interest; and a week later, during the same term, judgment was rendered against the bank in favor of Toombs for the use of Allison, for $487 principal, the original action having been amended at that term so as to proceed as stated. Afterwards a trial was had upon the issues between Sutlive and Allison, as to whether the fund was subject to Sutlive's judgment. The jury found in his favor, and Allison's motion for new trial was overruled.

Sutlive alleged, that Allison's verdict and judgment were fraudulent; that when the garnishment was issued, the cotton which produced the money named in the garnishee's answer was the property of Tumlin, and he, with intent to hide it and to hinder and delay Sutlive in the collection of his debt, pretended that he was the agent of Toombs, his son-in-law, in the purchasing of the cotton, and Toombs transferred and assigned the claim for the purpose of further hiding and concealing the money; that the bank, knowing that the money was the property of Tumlin, permitted Allison to take judgment against it without objection, and aided Tumlin and Allison to further attempt to hide the money and to hinder and defeat the collection of Sutlive's judgment; that $227.41 of the amount of Sutlive's judgment was expended by him at Tumlin's request, to protect said cotton and as part of the necessary expenses connected with the purchase and handling of the same, and Tumlin contracted to pay the same, for he was credited by Sutlive for that amount on the faith of the ownership of the cotton by him, and it would be a wrong and fraud on Sutlive for Toombs or Allison to take the cotton or its proceeds without paying the expenses incurred by Tumlin in buying, handling, and protecting it. Further, that the judgment in the trover suit in favor of Toombs for the use of Allison should have been so molded as not to prejudice the rights of Sutlive; and when said suit was being tried,

the presiding judge announced to all parties that the judgment should not prejudice the rights of parties in the garnishment case, except only to fix a sum certain in the contest between Allison and the bank, but in the face of this announcement and of the pleadings Allison entered up judgment absolute without reference to the rights of other parties, and the judge inadvertently signed the judgment so entered, relying on plaintiff's counsel to write it in pursuance of his announcement.

There was testimony for Sutlive, that the cotton that produced the fund in controversy was purchased by Tumlin in the fall of 1891. He was required to keep in the bank during that fall a bonus of $2.50 per bale for such cotton as he purchased; and the bank paid for the cotton. He kept the deposit in his own name, and all the accounts between him and the bank relating to the cotton were kept in his name. In his dealings with the bank he always claimed the cotton as his own; and the bank's cashier never heard of Toombs in connection with the cotton until about the time he brought suit against the bank, and never heard that Allison had any interest in it until about the time he was made a party to the suit. The bank always dealt with Tumlin as principal, and no agency for Toombs was disclosed by him. All of the principal amount of the judgment in Sutlive's favor, except $85, was advanced by him to pay insurance premiums on the identical cotton in controversy, and he gave credit to Tumlin on the faith of this cotton, believing it was his cotton. The insurance policies were made payable to the bank as its interest might appear. Tumlin always represented to Sutlive that the cotton was his; and Sutlive never heard of any claim that Toombs set up to it until suit was brought against the bank. The policies covered all the cotton Tumlin bought in the fall of 1891, including the 137 bales in controversy. Sutlive could not say how many bales the policies covered; for they were issued to cover a money value, and not bales or

pounds. Nor could he say whether or not he had the identical cotton which produced the fund in controversy when the policies were issued and the premiums paid by him for Tumlin; nor how much or what part of the money he so advanced was for the insurance of the 137 bales that produced the fund in controversy. The policies were deposited with the bank, and had been lost or destroyed. Tumlin purchased 500 bales of cotton in the fall of 1891. He deposited in the bank, to cover his purchases, bonus to the amount of $490. One item he deposited was $100 paid him by J. L. Sanders on his salary as a cotton buyer for Sanders. The largest sum he deposited at any time was $150. The deposits were made at different times and in small amounts. The cashier of the bank did not know where the bonus came from, nor whose money it was, but only that Tumlin deposited it in his own name and as if it were his money. Other testimony for Sutlive will hereafter appear from the motion for new trial.

The evidence for the claimant, Allison, showed, in brief, that Tumlin in buying cotton was acting as the agent of Toombs, his son-in-law, who furnished him, during the seasons of 1890 and 1891, between two and three thousand dollars to purchase cotton. The bonus required to be deposited in the bank was Toombs' money; not one dollar of Tumlin's money went into the purchase of the cotton. The 137 bales before referred to, which were the ones involved in the suit against the bank, were bought by him for Toombs. The accounts were kept by the bank in Tumlin's name for convenience and expediency in handling and trading the cotton, as Toombs had no objection to this. Tumlin had no interest in the cotton, except to manage it as best he could for Toombs. There never was any collusion between them, or between either of them with Allison, to hinder, delay or defraud Tumlin's creditors; but the cotton belonged to Tumlin, who in good faith transferred it to

Allison as additional security for a debt he owed Allison. This debt was past due in 1892, and Allison called on Toombs for payment, the amount of it being over $3,000. Toombs told him he had 126 bales of cotton on which the bank had a claim for advances, after paying which Toombs' interest would be twelve or fifteen hundred dollars, which he agreed to hold and pay over to Allison when collected. He afterwards stated that it was not a good time to sell, and Allison agreed to extend the time of payment on condition that Toombs would give his notes for the debt secured by mortgage, and allow the proceeds of the 126 bales of cotton to go on the first note due.    Toombs agreed to do this, and gave Allison two notes dated November 17, 1892, for $1,612.65 each, secured by mortgage, one of which notes fell due April 1, 1893.    He also signed an agreement in writing, stating that in consideration that Allison had renewed the note and mortgage he held, Toombs agreed to pay over to him the proceeds of the 126 bales of cotton, after paying the bank the advances made thereon.    He afterwards executed a written transfer to Allison of all his claims on the bank, to be credited, when collected, on the note held by Allison, said claim being about $1,200 "now being sued in the hands of Kennon & Irwin.    It is understood that the lawyer fees are to be deducted from   the amount collected.    This transfer is made as part of and in continuation of a previous contract in which I agree to pay over proceeds of my interest in cotton to F. M. Allison."

In addition to the grounds that the verdict was contrary to law and evidence, the motion for new trial assigns error upon the admission of testimony by Killingsworth, that during the fall of 1891, Tumlin borrowed of him ten dollars under a statement that he wanted it to use as a bonus to purchase cotton; and that witness lent him the money, but did not know what use he made of it, nor that he used

it in purchasing the cotton producing the fund in contro-
versy.    Also, the testimony of West, that he made Tum-
lin a loan of the same amount during the same fall under a
like statement of Tumlin; and the testimony of Burnett,
that he was in the employment of Tumlin during the same
fall, that Tumlin collected of Tom Whatley in that fall
thirty dollars for bagging and ties that Tumlin had sold
him for Blanchard, Humber & Co., and that Tumlin de-
posited ten dollars of it in the Bank of Fort Gaines to pay
bonus on cotton.    The objection urged to this testimony
was, that it was irrelevant, because it was not shown that
the money referred to went into the purchase of the cotton
that produced the fund in controversy.

Error is further assigned on the following instructions
in the charge of the court:

"If there was no collusion between Tumlin and Allison
or between Tumlin, Allison and Toombs, if Tumlin got
Toombs' money and did not apply it to the purchase of the
cotton as agreed to by them, and if you believe from the
evidence that Tumlin put up the bonus and that he was
transacting the business as his own business and it was his
own business, if you believe that from the evidence, you
should find the fund subject to the *fi. fa.*, whether there
was any fraud upon Allison's part or Toombs' part.

"If Tumlin was the agent of Toombs and his agency
was concealed, that is to say, if Tumlin was doing business
with Toombs' money and nobody knew it except Toombs
and Tumlin, then I charge you that Toombs is bound by
any contract made by Tumlin within the scope of Tum-
lin's authority, and Toombs' money so furnished would be
bound.

"If you believe from the evidence that Tumlin entered
into a contract for insurance on certain cotton not the
property of Tumlin, but Toombs' property bought by Tum-
lin with Toombs' money, and Tumlin's agency was con-

cealed; and if you believe that the judgment which is the foundation of this *fi. fa.* against Tumlin was for premiums for insurance on the particular cotton in controversy in the other proceedings which have been referred to, you should find the particular fund in court subject to whatever you believe from the evidence to be premiums owing for insurance as part of the *fi. fa.*

"If you believe it was proper on the part of Tumlin to insure the cotton bought by him, I charge you, if that cotton received protection from that insurance, no matter who the cotton belonged to, it would be subject to that much of the *fi. fa.* shown to be owing for insurance premiums on that particular cotton.

"If the cotton was transferred and the title passed from Tumlin and Toombs to Allison in payment of an old debt, and Allison did not part with anything of value at the time of the transfer, Allison's equity was not established, and you should find in favor of the plaintiff the premiums due for insurance to protect the cotton."

The court refused a request to charge as follows:     "If Tumlin received Toombs' money and did not actually use it in the purchase of said cotton, but put other money in the bank instead, and purchased cotton and bought this cotton and agreed for Toombs to have it, it became Toombs' property."

The motion for new trial further alleges, that the judgment in favor of Toombs for the use of Allison against the bank was conclusive evidence of claimant's title to the fund; there being no sufficient evidence to establish fraud or collusion or to set aside and impeach said judgment.

*W. C. Worrill* and *J. R. Irwin*, for plaintiff in error.
*J. D. Rambo, C. Wilson* and *W. A. Scott*, by *Harrison & Peeples,* contra.